UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| LYNDON MCKINNEY, JOHN BALDWIN JR., DOUGLAS BLACKSHIRE, DOUGLAS BLACKSHIRE JR., GREGORY BOYD, ULYSSES A. CHANEY, STEWART CLIFFORD, THEODORE COBBS, TONY COLTS, MARIO CORDAY DAVIS, FLOY DENSON, RENEE GREEN, DION GRIFFIN, WALTER HANKINS, WAYMON HARRIS, TYRONE HARRIS, VICTOR IRVING, KILIA IRVING, DONNELL JACKSON, CALVIN JAMISON, OTIS JONES, WILLIAM LASTER, DEMETRIUS LOVE, SAMMIE LUCKETT, LISA LUCKETT JONES, ULYSSES MARSHALL, EUNICE MARTIN, TREVA MATCHEM, JOE MILLER, RICKEY NORMAN, RONDALYN PERRY, JESSICA ROBINSON, DWAYNE F. SLADE, TODD SMITH, ANTOINE SYKES, DERRIS SYLVESTER, JACQUELINE THOMAS, ALLEN VAUGHN, KEVIN WALLACE, TYRONE WHITLEY, JAY WRIGHT, and JERRY L. YOUNG, Plaintiffs, v. MED GROUP TRANSPORTATION LLC and GENE SHIKHMAN, Defendants. | Case No. 13-CV-222-JPS  ORDER |

This action, filed in February of this year, was originally filed as a class action by plaintiff Lyndon McKinney ("McKinney"), asserting that defendants Med Group Transportation LLC ("Med Group") and Gene Shikhman ("Shikhman") violated the federal Fair Labor Standards Act

("FLSA") and Wisconsin's Wage Payment and Collection Laws ("WWPCL") when they did not compensate McKinney and other drivers for pre- and post-shift travel time, and when they did not award premium pay for hours worked in excess of forty per week. (Docket #1). The court conditionally certified a class pursuant to the parties' stipulation. (Docket #33). Defendants were ordered to produce a class list of all persons who have been employed as drivers between April 12, 2010, and March 11, 2013. The parties stipulated to grant McKinney leave to amend his complaint to add each individual who opted into the action as a plaintiff; plaintiffs so filed an amended complaint, the operative complaint for this action. (Docket #64).

This matter comes before the court on plaintiffs' motion for summary judgment. (Docket #65). In their motion, plaintiffs argue that they are entitled to summary judgment on their claims for premium overtime compensation and for compensation for time pre- and post-shift driving time. In opposition, defendants argue that they are exempted from the obligation to pay overtime premium pay because they are in the "business of operating taxicabs," one type of business exempted from overtime obligations under the FLSA. As to the charge that they must pay their drivers for pre- and post-shift travel time, Med Group argues, in part, that plaintiffs do not state a claim under the FLSA because the plaintiffs' compensation remained higher than the minimum hourly wage. For the reasons explained below, the court concludes that Med Group is not entitled to invoke the taxicab exemption to the FLSA, and that, therefore, Med Group is obligated to pay the plaintiffs premium overtime compensation for hours worked in excess of forty per week. The court further concludes that plaintiffs have not met their burden to prove entitlement to summary judgment on their claim for travel time

Page 2 of 20

Case 2:13-cv-00222-JPS   Filed 12/18/13   Page 2 of 20   Document 87

compensation. Accordingly, plaintiffs' motion will be granted in part and denied in part, for the reasons that follow.

1. Facts

The following undisputed facts are presented, for clarity of analysis, according to their relevance to the claims before the court.

1.1 Facts Relevant to the Taxicab Exemption

Med Group is a Wisconsin corporation located in Mequon, Wisconsin, that provides non-emergency medical transportation in Milwaukee, Waukesha, and Ozaukee Counties. Plaintiffs' Proposed Findings of Fact and Defendants' Response ("Pl. PFOF") (Dockets #67, #80) ¶ 1. Over half of Med Group's clients are elderly or disabled, and others require transportation for health care-related or mental health-related appointments, such as visits to their psychologist. Pl. PFOF ¶ 6. Drivers for Med Group use Med Group's vans to provide door-to-door transportation services to Med Group's clients. Stipulated Findings of Fact ("Stip. FOF") (Docket #66) ¶ 6. Med Group's vehicles are mostly Dodge and Chrysler minivans with the company logo on the side. Defendants' Proposed Findings of Fact and Plaintiffs' Response ("Def. PFOF") (Dockets #79, #83) ¶ 3. Some of Med Group's vans are modified to accommodate loading and unloading of wheelchair-bound clients, but fifty percent of the vehicles are ordinary minivans. Stip. FOF ¶ 15; Def. PFOF ¶ 3. Med Group's vans do not have a top light located on their roofs to indicate whether the vehicles are available for hire. Stip. FOF ¶ 16. The vans do not have the word "taxi" displayed inside or outside the vans, nor do they have the word "Milwaukee" or a Milwaukee-issued taxi permit number displayed outside the van. Stip. FOF ¶¶ 17, 18. Med Group does not display the rates that a client will be charged for services on the inside of

Page 3 of 20

Case 2:13-cv-00222-JPS   Filed 12/18/13   Page 3 of 20   Document 87

their vehicles. Stip. FOF ¶ 22. The vehicles have neither a taximeter to track the milage of the clients' trips, nor credit card machines to accept payment by credit card. Stip. FOF ¶¶ 20, 21.

Between ninety-five to ninety-eight percent of Med Group's business comes through contracts with third parties, including the Department of Aging, Logisticare, and MTM; these contracts require Med Group to provide transportation services to individual clients in return for payment from the agencies or brokers at a rate set by the contract. Pl. PFOF ¶¶ 2, 3. For clients transported under these contracts, Med Group does not collect payment at the time the transportation service is provided, but instead bills the appropriate third party and is paid at a later date. Pl. PFOF ¶ 4. The remaining two to five percent of Med Group's business comes from private pay clients. Stip. FOF ¶ 8. Med Group sets its own rates for private pay clients. Stip. FOF ¶ 10. These private pay clients either pay at the time services are rendered, or they are billed, depending on the client's relationship with Med Group. Stip. FOF ¶ 9.

Med Group contacts its drivers with information about their first pick-up for a given day on the night before that pick-up. Stip. FOF ¶ 25. The drivers first report to Med Group's Mequon location to pick up a vehicle. Pl. PFOF ¶ 18. While the first few pick-ups are generally scheduled for a driver each morning, the driver will not receive information about anything other than the first pick-up until he arrives at Med Group's Mequon location. Stip. FOF ¶ 27. After finishing their scheduled stops, the drivers call Med Group's dispatchers to determine where their next pick-up will be. Stip. FOF ¶ 28. Drivers continue to call the dispatchers via a two-way radio to determine every pick-up of the day after finishing their pre-scheduled stops. Stip. FOF

¶ 29. The drivers may experience standby time in the course of their day; during those times, they may take their breaks or run personal errands but they are required by Med Group to stay within a ten-block radius of their last drop-off. Stip. FOF ¶¶ 30, 31; Def. FOF ¶ 20. A driver's day ends when dispatch informs the driver that there are no more pick-ups for that driver that day. Stip. FOF ¶ 32. At the end of the day, the driver must return the van to Med Group's Mequon location within a half-hour of their last drop-off; drivers cannot continue to look for new customers after Med Group tells them that their shifts are over. Stip. FOF ¶ 33; Pl. PFOF ¶ 21. The drivers usually drop off their daily trip logs, which they are required to complete during the course of the day, when they drop off the vehicle, or when they pick up their vehicle prior to their next shift. Def. FOF ¶ 48. Drivers are not allowed to take Med Group's vehicles home overnight.[1] Stip. FOF ¶ 34. Med Group's drivers are not paid a percentage of fares they collect; instead they are paid an hourly rate that is generally around ten dollars per hour. Pl. PFOF ¶ 22. Med Group's drivers are permitted to receive tips from their passengers. Def. PFOF ¶ 23.

All of Med Group's clients must schedule transportation services through the company's dispatchers. Stip. FOF ¶ 11. Ninety-nine percent of Med Group's transportation services are pre-scheduled. Pl. PFOF ¶ 9. In four years of operation, Med Group has only had its drivers pick up unscheduled clients for "maybe 50 or more" rides. Pl. PFOF ¶ 10. On very rare occasions,[2]

---

[1]There appears to be one exception to this rule. One driver, Alan Vaughn, was allowed to keep the Med Group vehicle at home. Stip. FOF ¶ 44.

[2]The parties do not dispute that only 0.0004% of Med Group's rides were not pre-scheduled. Pl. PFOF ¶ 11.

Med Group's drivers may be approached for transportation by a private pay client, a client who was earlier dropped off by Med Group, or a client who has been pre-approved to use Med Group's services by the client's insurance; the drivers must call in to Med Group's dispatch for approval in order to transport the client. Pl. PFOF ¶ 8. While half of the time Med Group transports a single passenger, Med Group allows multiple, unrelated clients that are paying separately for Med Group's services to be transported in the same van at the same time. Stip. FOF ¶ 12; Def. PFOF ¶ 12.

Med Group has not been issued any permits for its vehicles by the City of Milwaukee. Pl. PFOF ¶ 14. The City of Milwaukee also requires specialized public passenger vehicle licenses ("PPLs") for drivers that provide personal transportation services to the public within the City. Pl. PFOF ¶ 15. Separate classes of PPLs are required in order to operate different types of public passenger vehicles, including "T" class for taxis and "H" class for handicapped elderly liveries. Pl. PFOF ¶ 16. Med Group has never required applicants for the Driver position to obtain a "T" class PPL in order to be hired, though Med Group could be subject to fines by the City of Milwaukee as a result. Stip. FOF ¶¶ 23, 24. Med Group does not advertise as a taxi service in the phone book. Stip. FOF ¶ 19.

Defendant Gene Shikhman is the husband of Med Group's owner, Dariko Mekvabishvili, and oversees Med Group's finances, human resources, and compensation practices on a daily basis. Stip. FOF ¶ 1. Throughout Med Group's existence, Shikhman has made all decisions regarding compensating Med Group's drivers and setting its employment practices. Stip. FOF ¶ 2. Shikhman has also prepared Med Group's payroll for its drivers throughout Med Group's existence. Stip. FOF ¶ 3.

In 2009, Shikhman made the decision not to pay Med Group's drivers overtime premium compensation for hours worked in excess of forty hours in a given workweek, despite his knowledge that the FLSA's requirement to pay overtime. Stip. FOF ¶¶ 4, 53; Pl. PFOF ¶ 24. In November of 2010, Med Group received notice that two drivers, Doug Nash ("Nash") and Jackie Robbins ("Robbins"), filed complaints with the Wisconsin State Department of Workforce Development. Def. PFOF ¶ 34. The State determined that Nash and Robbins were not entitled to overtime pay, and issued letter decisions to that effect; Med Group relied on those decisions to justify not paying overtime to its drivers. Pl. PFOF ¶ 29. The decisions interpreted the state WWPCL, but Med Group understood that the State was required to interpret its law as stringently as the existing federal standards. Def. PFOF ¶ 38. Med Group did not rely on communication or guidance from the United States Department of Labor regarding whether its drivers were entitled to overtime compensation. Stip. FOF ¶¶ 56, 57.

1.2 Facts Relevant to the Travel Time Claim

Until February 13, 2012, Med Group paid its drivers thirty dollars per week to account for travel time between the Mequon location and the first pick-up and last drop-off of the day. Stip. FOF ¶ 45. Med Group considered this payment to be a "fringe benefit" of employment. *See* Def. FOF ¶¶ 50, 51. Shikhman determined the thirty dollar amount by checking the schedules and determining that the drivers spent fifteen minutes on average each way. Stip. FOF ¶¶ 39, 40. Prior to February 13, 2012, all drivers received this thirty dollars per week, with two exceptions: (1) part-time drivers were compensated from the moment they arrived at the Mequon location, so they only received fifteen dollars to account for their post-shift travel; and (2) a

driver named Alan Vaughn did not receive the thirty dollars because he was allowed to keep the Med Group vehicle at his home. Stip. FOF ¶¶ 42, 43, 44. Med Group ceased the practice of paying the drivers the thirty dollars because of a decrease in pay rates in its contracts with Logisticare and the Department of Aging. Stip. FOF ¶ 46. From February 13, 2012, to March 11, 2013, drivers were paid starting at the time of their first pick-up and ending at the time of their last drop-off of each day. Stip. FOF ¶ 35. The drivers received no compensation for the pre- and post-shift travel, unless they had to travel outside the fifteen minute radius for their first pick-up, in which case they are allowed to include the additional travel time on their time sheet. Pl. PFOF ¶ 27; Def. FOF ¶ 49.

2. Legal Standard

The general standard for assessing motions for summary judgment applies, namely: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

3. Analysis

Med Group admitted in its Answer that it was an employer of the plaintiffs for purposes of the FLSA and WWPCL during the relevant time period, and that it is an enterprise engaged in commerce under the FLSA. Answer to Amended Complaint (Docket #74) ¶¶ 89, 90, 105-108. Further, the

parties do not dispute that Med Group did not compensate the plaintiffs for pre- and post-shift travel times, nor did Med Group award premium pay for overtime. Defendants claim that they are exempt from requirements to pay overtime because Med Group is an "employer engaged in the business of operating taxicabs." With regard to pre- and post-shift travel times, defendants claim, in part, that plaintiffs do not state a claim under federal law. The court addresses each argument in turn.

### 3.1 Pre- and Post-Shift Travel Time

Plaintiffs argue their entitlement to compensation for driving time from the Mequon location to the drivers' first pick-up of the day, and driving to the Mequon location after their last drop-off of the day. In their brief in support of their motion, plaintiffs argue that Med Group violated the FLSA in denying compensation for the drivers' time. Defendants answer, in part, by arguing that there is no violation of federal law when the total amount of compensation in a given week, divided by the hours worked that week, equals an hourly wage that exceeds the minimum wage of $7.25 per hour. In their reply briefing, plaintiffs concede the point with regard to any federal claim. Instead, they argue entitlement to compensation for pre- and post-shift travel time under Wisconsin law.

The court will not address plaintiffs' state law argument because it is not properly before the court. Raising new legal issues in a reply brief to a motion for summary judgment deprives the nonmoving party of their opportunity to respond, and deprives the court of full adversarial briefing on the issue. *See Parrillo v. Commercial Union Ins. Co.*, 85 F.3d 1245, 1250 (7th Cir. 1996) ("The appellee would have no opportunity to respond to the new claims, and the court would be in an awkward position. We could either

accept wholesale an 'argument' that had never been fully briefed or argued, or we could put ourselves in the position of the appellee, doing her research and seeking out counter-arguments on her behalf.") This point of practice holds equally true in the trial-level briefing of a motion for summary judgment. *See RB & W Mfg. LLC ex rel. RB & W Corp. v. Buford*, 2004 WL 2496242, at *4 (N.D. Ill. Nov. 4, 2004) (collecting cases).

On the record before the court, plaintiffs have not met their burden of proving entitlement to summary judgment on their claim for pre- and post-shift travel compensation, and accordingly their motion is denied as to this claim.

### 3.2 Taxicab Exemption

Defendants assert that Med Group is exempt from the provisions of FLSA and WWPCL that require premium pay for hours worked in excess of forty per week because Med Group is an "employer engaged in the business of operating taxicabs" under the FLSA, and because plaintiffs are "[d]rivers of taxi cabs" under the Wisconsin Administrative Code provisions related to the WWPCL. *See* 29 U.S.C. § 213(b)(17); Wis. Admin. Code DWD § 274.04(5). Med Group bears the burden of showing entitlement to invoke the taxicab exemption. *Helena Glendale Ferry Co. v. Walling*, 132 F.2d 616, 619 (8th Cir. 1942) ("Those asserting in reference to any employee, an exemption under the Act, must establish the exemption as being both within the spirit and the letter of the statute.") (citations omitted). Exemptions under the FLSA are to be construed narrowly against the employer who asserts them. *Brock v. Louvers and Dampers, Inc.*, 817 F.2d 1255, 1256 (6th Cir. 1987) (*citing Arnold v. Ben Kanowsky*, 361 U.S. 388, 396 (1960)). In determining whether Med Group shows itself to be so entitled, the court will focus on federal authority,

because the Wisconsin Administrative Code directs that its "exemptions shall be interpreted in such a manner as to be consistent with the Federal Fair Labor Standards Act and the Code of Federal Regulations as amended.…" Wis. Admin. Code DWD § 274.04. Whether or not undisputed job duties place employees under a specific FLSA exemption is a question of law, and is, therefore, amenable to resolution in a motion for summary judgment. *Roe-Midgett v. CC Services, Inc.*, 512 F.3d 865, 869 (7th Cir. 2008) (*citing Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)).

The FLSA does not define a "business of operating taxicabs," however, Chapter 24(h) of the Department of Labor Field Operations Handbook ("FOH") provides the following definition:

> The taxicab business consists normally of common carrier transportation in small motor vehicles of persons and such property as they may carry with them to any requested destination in the community. The business operates without fixed routes or contracts for recurrent transportation. It serves the miscellaneous and predominantly local transportation needs of the community. It may include such occasional and unscheduled trips to or from transportation terminals as the individual passengers may request, and may include stands at the transportation terminals as well as at other places where numerous demands for taxicab transportation may be expected.

Med Group argues that it meets the above-quoted definition, while plaintiffs maintain that Med Group does not.

Several courts have interpreted the FOH definition and the FLSA exemption in various factual contexts, and review of a few select cases provides a valuable illustration of how courts facing similar questions have resolved them. First, in a persuasive case from this district, *Herman v. Brewah Cab, Inc.*, my former colleague Judge Myron L. Gordon examined the

taxicab exemption in the FLSA in a very similar factual context. 992 F.Supp. 1054 (E.D. Wis. 1998). There, the employer, Brewah Cab, was engaged in the business of transporting elderly and disabled persons within Milwaukee County. *Brewah Cab*, 992 F.Supp. 1056. Brewah Cab's vehicles were Aerostar minivans, half-ton vans, station wagons, and minivans. *Id.* The half-ton vans and Aerostar minivans were all wheelchair-accessible; the court's opinion does not specify the wheelchair-accessibility of the other minivans and station wagons. *Id.* The vehicles displayed the company's name, telephone number, and a city inspection sticker. *Id.* None of the vehicles had a taximeter; rates were determined based upon milage, and those rates were posted on the vehicles' dashboards. *Id.* All passengers were required to prearrange transportation with Brewah Cab's dispatcher. *Id.* Drivers were assigned to work eight, ten, or twelve hours per day; Brewah Cab determined the shift on a daily basis, and gave the drivers a daily schedule identifying the passenger, destination, and time. *Id.* Drivers were not permitted to pick up passengers who did not prearrange their transportation. *Id.* Typically, Brewah Cab transported multiple passengers at a time. *Id.* Drivers were required to have a public passenger driver's license and they were required to receive training on CPR, handling seizures, customer assistance, wheelchair handling, and loading and unloading passengers. *Id.* at 1057. Brewah Cab was listed in the phone book under "transportation services for the disabled," not under "taxicabs." *Id.* Brewah Cab licensed their vehicles as handicapped elderly vehicles or as shuttles, but not as taxicabs. *Id.* Brewah Cab had contracts with two government entities to provide transportation to medical related appointments, as well as several contracts with non-governmental entities, such as the Midwest Dialysis Center and

Milwaukee Kidney Center, to provide transportation services to their clients. *Id.*

Judge Gordon concluded that Brewah Cab was not in the "business of operating taxicabs" for purposes of the FLSA exemption. This conclusion was informed primarily by the following facts: (1) Brewah Cab drivers were required to adhere to a daily schedule, while taxicab drivers pick up passengers at the driver's discretion; (2) Brewah Cab drivers transported multiple passengers at a time, while cabs typically transport one fare at a time; (3) Brewah Cab participated in several subsidy programs, whereas taxicab businesses typically receive their entire fare from the passenger; and (4) Brewah Cab was not licensed as a taxicab company and required the drivers to have additional training targeted to handicapped and elderly passengers. *Id.* at 1059-60. Judge Gordon rejected Brewah Cab's argument that the court should disregard these distinctions because they exist only because of Brewah Cab's client base. *Id.* at 1060. As the court explained, "The unique characteristics of the defendants' operation are exactly the factors that this court must consider in determining whether its operation was contemplated by Congress when it created the narrow exemption for taxicab companies under § 213(b)(17).

Since *Brewah*, several district courts have refused to exempt employers under the taxicab exemption, on similar logic. *See Rossi v. Assoc. Limousine Svcs., Inc.*, 438 F. Supp. 2d 1354, 1364 (S.D. Fla. 2006) (holding that employer "is in the business of operating limousines, not taxicabs" where drivers do not cruise for customers, vehicles cannot be flagged down by customers, and vehicles do not have taximeters); *Powell v. Carey, Int'l Inc.*, 490 F. Supp. 2d 1202, 1213 (S.D. Fla. 2006) (no taxicab exemption for limousine company that

Page 13 of 20

Case 2:13-cv-00222-JPS   Filed 12/18/13   Page 13 of 20   Document 87

advertises as a chauffeur, does not permit drivers to cruise for passengers, and bases fares on flat or hourly rates and not a metered rate); *Mascol v. E&L Transportation, Inc.*, 387 F. Supp. 2d 87, 97 (E.D.N.Y. 2005) (no taxicab exemption for ambulette drivers who transport mobility-limited passengers, ninety-five percent of business comes from New York State via Medicaid, the vehicles are not metered, and the rates are set).

The parties cite one case finding the taxicab exemption to be applicable. The District Court for the Southern District of New York considered whether an employer running an airport limousine service from the Westchester County Airport was entitled to the taxicab exemption. *Cariani v. D.L.C. Limousine Service, Inc.*, 363 F.Supp.2d 637, 638 (S.D.N.Y. 2005). There, employer D.L.C. Limousine Service ("D.L.C.") maintained a fleet of seven cars and operated within a radius of approximately 100 miles of the Westchester County Airport. *Id.* at 639-40. The cars were unmetered, did not have "vacancy" lights on top, and could be dispatched directly from its stand at the airport or by phone if a passenger called to schedule service. *Id.* at 639. The cars did not run on fixed routes, and were available to go wherever the passenger wished, and when the passenger wished. *Id.* at 640. D.L.C. was listed in several phone books under "Airport Transportation" and/or "Limousine Services," but not under "Taxicabs." *Id.* The plaintiff was paid an hourly wage plus commissions, and was not compensated with premium pay for hours worked over forty. *Id.* at 638.

The court held that the taxicab exemption applied to D.L.C.'s business, citing the FOH definition. *Id.* at 645. The court cited the following facts in support of its conclusion: (1) D.L.C.'s drivers do not cover fixed routes or adhere to fixed schedules; (2) D.L.C. offered door-to-door service, and "the

convenience of the customer" was the primary motivation, as opposed to a third-party contract; (3) D.L.C.'s fares were similar to the fares of local taxicab businesses. *Id.* at 644. The court acknowledged that D.L.C. did not advertise as a taxicab company and was not regulated as a taxicab company, but concluded that the advertising was not determinative in light of D.L.C.'s satisfaction of the other criteria in the FOH definition. *Id.* at 644, 645. The court then distinguished D.L.C. from the analysis in *Brewah*, noting that a significant portion of Brewah Cab's business was pursuant to a publicly-subsidized contract for recurrent transportation of handicapped individuals, which is a factor articulated in the FOH definition as not being characteristic of a taxicab business. *Id.* at 645.

The *Cariani* case has come under some criticism since its publication eight years ago. In *Rossi v. Associated Limousine Services, Inc.*, the District Court for the Southern District of Florida refused to follow *Cariani*, noting that the FOH "itself provides that driving in connection with the operation of an airport limousine service is an example of work which is non-exempt under the taxicab exemption." 438 F.Supp.2d 1354, 1364 n.5 (S.D. Fla. 2006).

Having reviewed the relevant case law and FOH definition, the court concludes that Med Group does not qualify for the taxicab exemption. First, turning to the FOH definition, the court finds it critical that the Department of Labor excluded businesses operating with "contracts for recurrent transportation." The vast majority of Med Group's business, between ninety-five and ninety-eight percent, comes from contracts with third parties. Med Group argues that relying on the governmental contracts as a factor would "obviate that exemption" because "the majority of taxi companies provide subsidized rides to participants of various public assistance programs."

However, the fact that the majority of taxi companies receive some funding from public assistance programs, even if proven,[3] does not obviate the exemption, but rather raises the question of degrees. In determining whether or not the exemption applies, the court is called on to articulate and balance several factors, and a taxicab company that receives a small portion of its business through subsidized contracts operates a different business than a medical transportation company that receives ninety-five to ninety-eight percent of its business through these types of contracts. Med Group's funding thus weighs heavily against applying the taxicab exemption. Furthermore, several other facts of the drivers' work likewise weigh against the exemption. Med Group does not advertise as a taxi company and is not licensed as a taxi company; its drivers do not cruise for passengers, the vehicles do not have a vacancy light on the roof to signal availability for hire, and historically the drivers have very rarely transported unscheduled passengers. Finally, though the court does not agree with the analysis of *Cariani*, that court articulated a factor that is germane to the ordinary understanding of the word "taxicab," namely, that taxicabs operate for the "convenience of the customer." Typically, when one hires a cab, either by phone or on the street, one expects the cab to drive directly to the desired destination; certainly, if a hired taxi driver were to continue cruising to find

---

[3]The evidence Med Group cites to support this proposition is insufficient. Med Group cites an affidavit statement that American Taxi Company in Milwaukee is a contracted vendor to provide transportation to participants in such programs. Skikhman Aff. (Docket #76) ¶ 13. Med Group also cites a declaration from Steven C. Johnson, the President of Specialized Transport Services, Inc., who avers that about 25% of his company's business are participants in various public assistance programs. Steven Johnson Decl. (Docket #77) ¶ 11. And finally, Med Group offers an article from the Shepherd Express, a local newspaper, which relays that Milwaukee County subsidizes "roughly 5,000 Paratransit taxicab rides per month."

a second passenger, or even to stop to pick one up along the way, this would be unusual by the ordinary understanding of the service for which a taxi driver is paid. Here, it is undisputed that half of the rides Med Group provides are multi-passenger rides, a service which is undoubtedly less convenient for the customer. Taken together, all of these facts show that, while Med Group may engage in some activities that are similar to a taxi company, Med Group provides a different type of transportation service than an ordinary taxi company. Given the mandate that FLSA exemptions are to be narrowly construed, *Brock v. Louvers and Dampers, Inc.*, 817 F.2d 1255, 1256 (6th Cir. 1987), the court must conclude Med Group's drivers do not fall under the taxicab exemption. Plaintiffs are entitled to summary judgment on this claim.

### 3.3 Damages

Having concluded that plaintiffs are entitled to compensation for overtime, the court now turns to the issue of damages. Preliminarily, the court will not rule on the fact issue of the amount of overtime compensation Med Group owes the plaintiffs because the amount is, on the current record, disputed. The figures plaintiffs provide appear to include pre- and post-shift travel, hours for which they have not proven entitlement to compensation. (See Section 3.1, *supra*.) The plaintiffs did not provide damage calculations for overtime compensation that is exclusive of the claim for travel time. Thus, on this record, there remain issues of fact making it imprudent for the court to decide the amount of damages due to the plaintiffs.

There remains one issue of law on which the court can and should rule: plaintiffs argue entitlement to liquidated damages under 29 U.S.C. § 216(b), which provides that "[a]ny employer who violates the

provisions of section 206 or section 207 of [the FLSA] shall be liable to the employee or employees affected in the amount of their unpaid…overtime compensation,…and in an additional equal amount as liquidated damages." However, pursuant to 29 U.S.C. § 260, the court has discretion to decline to award liquidated damages, "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act…." Med Group bears the burden of proof to show that its denial of overtime compensation was made in good faith and that it had reasonable grounds for believing that it was not violating the FLSA. *Shea v. Galaxie Lumber & Constr. Co.*, 152 F.3d 729, 733 (7th Cir. 1998). There is a "strong presumption" in favor of awarding liquidated damages. *Id.*

Med Group avers that Shikhman researched Med Group's obligations under the FLSA and WWPCL in November 2010, reviewed both *Cariani* and *Brewah*, and believed that Med Group's drivers fell under the taxicab exemption from overtime compensation. As plaintiffs show, even if Shikhman believed he acted reasonably and in good faith, the question must be viewed objectively, and not based on Shikhman's subjective intent. *Walton v. United Consumers Club*, 786 F.2d 303, 312 (7th Cir. 1986). Plaintiffs argue that it is objectively unreasonable to rely on the analysis in *Cariani*, while not relying on *Brewah*, a case that is from this district and evaluating an employer more factually similar to Med Group. The court agrees. It is not uncommon that courts reach different conclusions when undertaking what is essentially a multi-factor balancing test; the relevance of the cases and analysis thus turns on the facts. In this instance and as explained above, the facts of *Cariani*

are distinguishable from Med Group's operation. Moreover, *Cariani* pains itself to distinguish the analysis in *Brewah* by noting that a significant portion of Brewah Cab's business was pursuant to a publicly-subsidized contract for recurrent transportation of handicapped individuals, a factor articulated in the FOH definition as not being characteristic of a taxicab business. *Cariani*, 363 F.Supp.2d at 645. Of course that one fact, which the court in *Cariani* found to be adequate to distinguish *Brewah*, is, of course, a fact that would also distinguish Med Group's operation from the case's analysis. In the end, the court cannot agree that reliance on *Cariani* is objectively reasonable under the circumstances.

Med Group also asserts that its reliance on the State's determination regarding Mr. Robbins's and Mr. Nash's complaints was objectively reasonable, especially because the State is required to interpret the WWPCL to be consistent with the FLSA. The court is not persuaded. As plaintiffs argue, Shikhman was aware of the *Brewah* case, and thus knew that the Robbins and Nash letters at a minimum conflicted with that case's holding and analysis. (Dockets #76-1, #76-2). Moreover, the *Brewah* case was a final adjudication on the merits under FLSA in a written opinion, while the State's determination letters cite no legal authority, other than mentioning the state statute twice, and contain no rigorous legal analysis. Furthermore, both decision letters acknowledge the fact that the drivers have recourse "in court," despite the investigator's conclusion that no violation stands. That is, the letters explicitly acknowledge that the opinions contained therein are not final adjudications of the drivers' legal rights (and, thus, Med Group's legal obligations). The court concludes that defendants' reliance on the State letters is not objectively reasonable for purposes of 29 U.S.C. § 260. The plaintiffs are

entitled to liquidated damages; once a valuation of the plaintiffs' unpaid overtime compensation is complete, such figure shall be doubled to reflect the award of liquidated damages.

Accordingly,

IT IS ORDERED that plaintiffs' motion for summary judgment (Docket #65) be and the same is hereby GRANTED in part and DENIED in part.

Dated at Milwaukee, Wisconsin, this 18th day of December, 2013.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge

Page 20 of 20

Case 2:13-cv-00222-JPS   Filed 12/18/13   Page 20 of 20   Document 87